MaddeN, Judge,
delivered the opinion of the court:
The plaintiff was, in December 1945, a commissioned officer in the United States Navy on active duty. En route to the United States for separation from active duty, he stopped at Noumea, New Caledonia. Surplus war equipment was there being sold by the Government’s Foreign Liquidation *324 Commission. The plaintiff selected two steel warehouses which had never been uncrated and some 12 tons of corrugated sheet metal. The plaintiff’s wife and her mother and stepfather, a Mr. Glavish, were in Auckland, New Zea-land, about 1,000 miles away from Noumea. The plaintiff and the Government’s selling agent agreed on a price of $1,000 for the material to be delivered f. o. b. shipside, Auckland, New Zealand. The plaintiff paid the $1,000 and received several copies of a “shipping ticket” showing the material, the price, and the f. o. b. provisions. This document was undated, but was made about December 5, 1945.
Arrangements were made to take the materials to Auckland aboard a United States Naval vessel, the LST 275 which was sailing immediately. The vessel’s skipper was willing to carry the shipment which would be useful for ballast. The plaintiff, prudently, saw to it that the right goods were placed in the right ship, so that they would not get lost in the general confusion of breaking up camp and going home, which was the objective of the Americans in Noumea.
Because the plaintiff was going to the United States and his wife 'was in Auckland, the shipping ticket showed that the goods were to be shipped to his wife, Mrs. J. C. Gager, in Auckland. The plaintiff gave an envelope containing a description of the materials and a copy of the shipping ticket to the skipper of the LST who agreed, as a personal accommodation to the plaintiff, to give them to the plaintiff’s wife in Auckland.
The plaintiff resumed his journey to the United States. The goods were carried promptly to Auckland, arriving there on December 12. The local firm of Henderson and MacFarlane, Ltd., were the agents for the United States Joint Purchasing Board at Auckland, and handled the entry of LST 275 there. That firm, as well as the United States officials there, had apparently never known of an instance where a service ship had carried a commercial cargo for an individual. They did not construe the “f. o. b. shipside, Auckland” as indicating that no freight charge was to be paid, or they thought that if it did mean that, there was some irregularity about it. They therefore computed a freight *325 charge at commercial rates, which came to $918.76. A customs duty somewhat larger than the freight charge was also imposed by New Zealand. Mrs. Gager did not pay these charges. Couldrey & Company, a local shipping and transit firm, acting as agents for Henderson and MacFarlane and also, to some extent at least, for Mrs. Gager, moved the goods to a vacant lot owned by the New Zealand Harbor Board and made a warehouse entry to cover the goods.
Mrs. Gager cabled the plaintiff in the United States, advising him that the goods were being held for freight charges. He received the cablegram on January 2, 1946. He contacted the Army, the State Department, and the Department of Commerce in an effort to get the shipment released. He obtained employment on a commercial ship which was sailing to New Zealand and arrived in Auckland in March 1946. He went to Henderson and MacFarlane, but they still refused to release the shipment. He went to the American officials at Auckland and was told that they would request Henderson and MacFarlane to release the shipment. He then went to the customs officials to inquire whether the nonpayment of the customs duty, amounting to $953.70, was holding up delivery of his shipment. The customs officials advised plaintiff that they were not pressing a claim for payment of the duty at that time and suggested that plaintiff take the matter up with them again after he had settled the freight charge dispute.
Plaintiff’s stopover in Auckland was a matter of some-two days and he was forced to leave on April 1, 1946, without obtaining the release of his property.
Sometime in April or May 1946, Mrs. Gager had to take the last “war bride” vessel sailing to the United States. The goods had not yet been released and the Joint Purchasing Board officials were still insisting that freight charges must be paid. Inasmuch as Mrs. Gager could not be in Auckland to continue pressing for the release of the goods, nor would she be there to receive them if they should be released, she sold the property to her stepfather, Mr. J. J. Glavish for 300 New Zealand pounds, or $977.40. The date of this sale is uncertain, but it was sometime in April or May, 1946.
*326 When Mr. Glavish acquired the property, storage charges and customs duty amounted to $1,211.98, and the Government was still demanding payment of the freight charge of $918.76. Couldrey & Company advised Mr. Glavish of these charges and the fact that the property was deteriorating in the weather. Mr. Glavish was given ten days to decide what he was going to do about the property. With the permission of the Joint Purchasing Board, Mr. Glavish arranged a sale to the Marist Old Boys Football Club of enough of the materials to build two huts, for $3,909.60, and on June 5,1946, used the money to pay the charges against the property. When the club had built its huts there was material left over and Mr. Glavish demanded its return and sued the club to enforce his demand. The leftover material was worth some $1,400. We do not know the outcome of the suit.
Henderson and MacFarlane were finally instructed by the American authorities to refund the freight charges, and they were refunded to Mr. Glavish, who had paid them, about September 1,1947.
Consideration of the case has been made difficult by the fact that Mrs. Gager, although available, was not called as a witness. It seems that she and the plaintiff have separated.
We think the plaintiff was the owner of the property in question. There was, apparently, some plan whereby his wife and another person were to acquire an interest in it, and it was to be used to start some kind of a business in New Zealand. But the plaintiff paid for the property, and we think no one else had acquired an interest in it before it was sold by Mrs. Gager.
The plaintiff says that his wife did not sell the property to Mr. Glavish. We are satisfied that she did. The plaintiff, since he was leaving for the United States immediately after he bought the property, must have intended to give his wife considerable authority to deal with the property. Since she was leaving New Zealand it would have been reckless for her to have left the property undisposed .of, deteriorating in the weather and accumulating storage charges.
The plaintiff’s contract of purchase entitled him to have the goods carried to Auckland without any charge against him for freight. The arrangement was unusual, but was not *327 illegal, as would seem to be proved by the fact that, after much deliberation, the freight charges that were collected were refunded. The fact that the arrangement was unusual, was outside the normal routine, was the cause of the difficulty. When goods arrived, consigned to a private person, and with papers indicating that the consignor had not paid any freight, it, quite naturally, looked to Henderson and MacFarlane as if the consignee should pay the freight. It was not improper for them to take that position, and leave the decision to their principals, the United States Government authorities. Those authorities investigated the facts, considered the question, and, at last, refunded the freight money to the person who had paid it.
The assertion of the freight charge was contrary to the provisions of the plaintiff’s contract of purchase, and the detention of the goods for that charge was a breach of contract. As a consequence of the breach of contract, the goods could not be sold to advantage or otherwise used, and in view .of Mrs. Gager’s imminent departure, her sale of them to Mr. Glavish for what she could get for them was not unreasonable. She got $977.40 and was relieved of paying customs duties of $953.70. She was also relieved of paying storage charges, but it is probable that, if the goods had not been wrongfully detained at the Government’s behest, storage charges would not have been incurred.
We have found that the property in question had a value in New Zealand of about $5,000. Because of the Government’s breach of contract, the plaintiff got only $977.40 in cash and relief from a customs charge of $953.70. He is entitled to recover the difference between the sum of these items and $5,000, which difference is $3,068.90.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and JoNes, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
*328 1. Plaintiff, John C. Gager, is a citizen of the United States and a resident of the District of Columbia.
2. In December 1945, plaintiff was a commissioned officer in the United States Navy on active duty. While en route to the United States for separation from active duty, he stopped at Noumea, New Caledonia. At that time a great deal of Government equipment in Noumea had been declared surplus and was being sold by the Government’s Foreign Liquidation Commission and by the Engineer Section of the Army’s South Pacific Base Command. The Government wished to sell this material for American dollars and have it removed from New Caledonia as quickly as possible.
3. Plaintiff decided to purchase two stran steel warehouses which had never been uncrated, and some 12 tons of corrugated sheet metal. Inasmuch as this material was still under the jurisdiction of the Army Engineer Section, an official of Foreign Liquidation Commission referred plaintiff to Lieutenant Thomas J. Bonica, who was an assistant contracting officer in charge of making recommendations for sales of surplus material.
4. On December 3, 1945, Lieutenant Bonica executed an Informal Action Sheet recommending to his superior officer that the two warehouses and the sheet metal be sold for a total price of $1,000 and that the recommended price should include the shipping charges on the materials to Auckland, New Zealand. This document advised that a Mrs. J. C. Gager, of Auckland, New Zealand, was interested in purchasing the material and that, in the opinion of the Lieutenant, the materials were not economically salvageable. This recommendation was approved by a major in the Corps of Engineers and by an officer of the Office of Foreign Liquidation. The latter approval was accompanied by a handwritten statement as follows:
Sale of scrap by Army
Shipping F. O. B. Auk. N. Z.
Approved
[Signature]
OFLC
Noumea
*329 5. On December 4, 1945, Lieutenant Bonica executed a document entitled “Account of sales of public property at public auction or on sealed proposals,” under the direction of the Surplus War Property Sales Officer, Army. This document showed that two stran steel warehouses had been sold to Mrs. J. C. Gager for a total price of $1,000,[1] and that the purchase price had been turned over by Lieutenant Bonica to the proper Army authority for credit to the surplus property account.
6. Lieutenant Bonica also executed a shipping ticket[2] showing the consignor to be Headquarters, South Pacific Base Command, APO 502, Engineer Section. The consignee named was Mrs. Gager. On the face of the shipping ticket was typed “Materials to be delivered F. O. B. Ship-side, Auckland, N. Z.” This document also acknowledged receipt by Lieutenant Bonica, as assistant contracting officer, of $1,000.
7. A shipping request was prepared on December 5, 1945, requesting transportation of the materials in question to Mrs. Gager in Auckland, New Zealand, and bearing the statement “Materials to be delivered F. O. B. Shipside Auckland, New Zealand.” The shipping request described the articles, noted their weight and cubic measure, gave the location of the material in Noumea, and stated that the shipment was immediately available. This request originated with Headquarters, 1192nd Engineers Base Depot, and Lieutenant Bonica was listed thereon as the person to be called.
8. Because plaintiff was returning to the United States for discharge and would not be able to receive the materials in Auckland, his wife, who was in Auckland, was named as consignee on the shipping ticket as well as on the other documents relative to the sale.
9. A Naval vessel, the LST 275, was then due to sail from Noumea to Auckland, New Zealand, and arrangements were *330 made with the commanding officer of the ship to take the shipment aboard for transportation to Auckland. The commanding officer was glad to have this material aboard since it would supply additional ballast needed for the ship on the ocean voyage.
10. On or about December 5,1945, plaintiff visited the two areas where the materials purchased were stored and made sure that the Army personnel who were collecting the boxes and the sheet metal for loading on the LST, knew the name and the location of the ship. The whole Noumea area was in a state of general confusion resulting from the breaking up of camp, the efforts to dispose of large quantities of surplus war material, and the departure of troops for home.
11. Plaintiff placed a description of the materials and a copy of the shipping ticket in an envelope which he gave to the LST skipper who agreed, as a personal accommodation to plaintiff, to give the documents to plaintiff’s wife in Auckland.
12. On December 12, 1945, the LST 275 arrived at Auckland. A local firm, Henderson & MacFarlane, Ltd., acting as shipping agents for the United States Joint Purchasing Board at Auckland, handled the entry of the ship. That firm had received from the Water Division of the Joint Purchasing Board in Auckland, a United States Army ocean manifest, certified to by Lieutenant Colonel Phillips, Transport Corps, Superintendent, South Pacific Base Command, APO 502, covering several items aboard the vessel, including plaintiff’s property. Up to that time, Henderson & Mac-Farlane had collected freight charges only on goods carried on commercial vessels. On United States Government vessels, no freight had been collected except by a sort of balance sheet transfer between one armed service and another, where necessary.
13. Because the carriage of goods aboard a Government ship and consigned to a private individual was outside the experience of both the shipping agency and the United States Joint Purchasing Board, it was decided to collect freight charges at the commercial rate on plaintiff’s property because such charges might be due and unpaid.
*331 14. The freight charges at commercial rates amounted to $918.76, and Mrs. Gager, the consignee, refused to pay them, believing that freight had been prepaid.
When Henderson & MacFarlane refused, on direction of the Water Division of the Joint Purchasing Board, to deliver the goods, Mrs. Gager immediately cabled her husband in Washington, D. 0., advising him of the situation and asking for instructions. She then arranged with Couldrey & Company, a local transit firm, to act for her in her efforts to have the shipment delivered without payment of freight charges.
15. The shipment had been unloaded on the dock on December 14, 1945. The Auckland Harbor Board requested that it be moved elsewhere since the space was needed for other purposes. Couldrey & Company, acting as agents for Henderson & MacFarlane, secured permission from the Harbor Board to store the shipment on a vacant lot belonging to the Board and, after making a warehousing entry respecting the goods, Couldrey moved them to the vacant lot.
16. Plaintiff did not receive his wife’s cablegram until his arrival in Washington, D. C., on January 2,1946. He immediately contacted the Army, the State Department and the Department of Commerce, exhibiting his copy of the shipping ticket which called for delivery f. o. b. shipside Auckland, New Zealand, and requesting their assistance in having the shipment released to his wife without the payment of freight.
17. Upon his discharge from the Navy, plaintiff set about finding a means of going to Auckland and finally obtained employment as third mate on a commercial vessel which was due to arrive in Auckland late in March 1946.
18. On or about March 30, 1946, plaintiff’s ship docked at Auckland and plaintiff went at once to Henderson & MacFar-lane, presented his shipping ticket and requested the immediate release of his shipment. Plaintiff also demanded proof that Henderson & MacFarlane were in fact the authorized agents of the United States Joint Purchasing Board. He was unable to obtain any satisfaction whatever from the Henderson firm.
*332 19. Plaintiff next took the matter up with the officials of the United States Joint Purchasing Board, Water Division. He again exhibited his shipping ticket and asked that his goods be released. Those officials indicated to plaintiff that they would recommend release of his goods.
20. Custom duty in the amount of $953.70 (£292.14.6) was due the New Zealand government on account of the importation of plaintiff’s goods. Mrs. Gager had not paid this duty and Mr. Gager went to the customs officials in Auckland to find out whether delivery of his goods was being held up for any reason having to do with customs. The customs officials advised plaintiff that they were not pressing a claim for the duty at that time and that they had had no hand in preventing the delivery of the goods to Mrs. Gager. They suggested that plaintiff first settle the matter of the freight charges and then return to the customs officials and settle the customs charges. Mr. Gager then discussed with these officials certain arrangements he was making for importing other goods which he had purchased.
21. Prior to his purchase of the goods in question, Mr. Gager had sent his wife $4,000 to meet any expenses which might arise in connection with materials he might buy and send to her in New Zealand. When the goods in question arrived in Auckland in December 1945, Mrs. Gager, as agent for her husband, had sufficient funds to pay the customs duty. When Mr. Gager arrived in Auckland in late March 1946, he was able and willing to pay the customs duty but payment was not demanded of him.
22. Plaintiff’s stopover in Auckland was a matter of some tw.o days and he was forced to leave with his ship on or about April 1,1946, without securing the release of his goods.
23. Sometime in April or May 1946, Mrs. Gager had to take the last “war bride” vessel sailing to the United States. The goods had not yet been released and the Joint Purchasing Board was still insisting that freight charges must be paid. Inasmuch as Mrs. Gager would not be in Auckland to receive the goods if they should be released, or to continue pressing for their release, she sold them to her stepfather, Mr. J. J. Glavish, for 300 New Zealand pounds, or $977.40. The exact date of this sale is not established, but *333 it was sometime during the months of April or May 1946.
24. It is not established by the evidence whether or not Henderson & MacFarlane saw a copy of plaintiff’s shipping ticket immediately upon the arrival of the LST 275 at Auckland. However, Couldrey & Company, their agents, did come into possession of a copy of the shipping ticket soon after the goods arrived in Auckland, and an official of that firm took the ticket to an official of the United States Joint Purchasing Board, Water Division, and called attention to the notation on the ticket that the goods were sold f. o. b. ship-side Auckland. The Joint Purchasing Board official took possession of the shipping ticket and advised Couldrey & Company that further inquiries would be made in Noumea, New Caledonia, to determine whether the freight charges had actually been paid in advance as the ticket seemed to indicate.
Despite their advice to Mr. Gager in March 1946, that they would recommend release of his property, officials of the Joint Purchasing Board continued to take the position that the notation “Materials to be delivered F. O. B. Ship-side, Auckland, N. Z.,” was ambiguous, and they refused to permit the release of the materials unless the freight charges at the commercial rate were paid at Auckland.
25. On or about May 1, 1946, Mr. Glavish was advised by Couldrey & Company that the material was probably deteriorating in the weather, that the Joint Purchasing Board would not permit release of the goods until the freight charges were paid, and that the Auckland customs authorities were pressing Couldrey & Company to complete the customs formalities. Mr. Glavish was given until May 10, 1946, to decide what action he would take concerning the shipment.
26. Mr. Glavish made no objection to the payment of the customs duty and the handling and storage charges, but he maintained that he should not have to pay the freight charges. He advised Couldrey & Company that he would have to sell materials in order to raise the funds to pay all the various charges, including freight; that if the Joint Purchasing Board would permit him to make the sale, he would pay all charges from the proceeds of the sale but would hold Couldrey & Company liable for the amount of *334 the freight charges if it were finally established that such charges were not due.
27. The officials of the Joint Purchasing Board decided that Mr. Glavish should be permitted to sell the property so that he could pay the charges. Couldrey & Company were advised, however, that they would be liable to the Board for the amount of freight charges which were collected from Mr. Glavish and which the Board still maintained were due and owing to the United States.
28. In May 1946, Mr. Glavish concluded a sale to the Marist Old Boys Football Club, of enough of the materials to build two huts. The sales contract provided that the purchase price was $3,909.60 and that any materials not used would be returned to Mr. Glavish.
29. On June 5, 1946, Mr. Glavish paid all charges against the property including the freight charges. Couldrey & Company held the amount paid to settle the freight claim in trust pending the outcome of the dispute.
30. On August 4, 1947, more than a year after the sale of the property by Mr. Glavish and the payment of the freight, customs and other charges, the office of the Director of Intelligence, U. S. Army, Attache Branch, advised the Military Attache at the American Embassy in Wellington, New Zea-land, that commercial freight charges in connection with the Gager shipment had never accrued and that collection of such charges should not have been made in Auckland on behalf of the United States. The Attache was directed to have the freight charges which had been collected, refunded to “the recognized legal claimant, be he Mr. Glavish, Mrs. John C. Gager, Mr. John C. Gager, or other party.” This communication also stated:
The United States Government waives all rights thereto in that the contract against which shipment was made indicates that such shipment was to have been made F. O. B. shipside, Auckland, New Zealand.
31. On or about September 1, 1947, Couldrey & Company refunded to Mr. Glavish the $918.76 which he had given them to cover the erroneously assessed freight charges.
32. On August 21, 1947, a few days prior to the date on which the above refund was made to Mr. Glavish, the Ad- *335 jut ant General’s office advised plaintiff that action had been taken to cause a refund to be made of the freight charges and that the War Department did not intend to take any further action in the matter.
On September 16, 1947, plaintiff replied, stating that he felt his contract with the government had not been carried out according to its terms and asking that the contract be renegotiated “on terms satisfactory to both parties at the present time.” Upon receipt of this letter, the War Department decided that this new problem should be turned over to the Judge Advocate General for his recommendation “inasmuch as the subject matter partakes of the nature of a claim.”
33. On March 9, 1948, plaintiff filed a claim with the Claims Division of the General Accounting Office for the replacement cost of the materials he had purchased and never received, and for the expense he had incurred in prosecuting the claim.
Approximately a year later (April 7,1949), the Adjutant General’s Office recommended to the Chief of Finance that plaintiff’s claim should be turned over to the General Accounting Office.
34. On August 25, 1949, the Comptroller General issued a settlement certificate disallowing plaintiff’s claim on the ground that since all the contract documents bore Mrs. Gager’s name, Mr. Gager was obviously not the real party in interest as far as the Government was concerned.
35. On January 9, 1950, Mrs. Gager, through her attorney, presented her claim to the General Accounting Office for damages for breach of the same contract.
On September 12, 1950, the General Accounting Office issued a settlement certificate disallowing Mrs. Gager’s claim on the ground that she had divested herself of title to the property in May 1946 when she sold it to Mr. Glavish.
36. On June 7,1951, plaintiff wrote to the General Accounting Office expressing dissatisfaction with the settlement of his claim and, in effect, requesting reconsideration. On August 21, 1951, the General Accounting Office sustained the disallowance of the claim. In November 1951, plaintiff brought suit in this court.
*336 37. Mrs. Gager was plaintiff’s agent to receive delivery of the goods in accordance with the contract of sale, in Auckland, New Zealand, and to deal with the property on her husband’s behalf after its arrival in any manner best calculated to protect his interests and also to minimize the damages accruing to the Government.
Mrs. Gager’s refusal to pay the erroneously assessed freight charges was not unreasonable under the circumstances.
Mr. Gager’s failure to pay the freight charges when he was in New Zealand at the end of March 1946, was not unreasonable in view of the advice given him by the official at the Joint Purchasing Board that his property would be released shortly without payment of freight.
38. Although customs duty was owing on the goods, the duty was not paid by Mrs. Gager in December 1945, when the goods arrived, nor in March 1946, by Mr. Gager when he was in Auckland, because the Customs officials were willing to withhold collection for a reasonable time pending settlement of the dispute regarding the possible obligation of plaintiff to pay freight charges.
As soon as the Customs officials determined that a reasonable time had expired and that customs formalities should be completed late in April 1946, the then owner of the property, Mr. Glavish secured permission to sell the property and paid the customs duty and all other charges on June 5, 1946. It was more than a year later before the freight charge controversy was settled and the freight money refunded to Mr. Glavish on order of the United States.
39. When the freight controversy had not been settled by the time Mrs. Gager had to take the last “war bride” vessel to the United States, she sold the property to Mr. Glavish for $977.40. Under the circumstances, Mrs. Gager did the best she could to protect her husband’s interests and to minimize the Government’s damages.
40. At the time plaintiff’s materials arrived in New Zealand (the winter of 1945-1946), materials manufactured from metal were scarce and the shipment was a valuable one in New Zealand.
The two warehouses were new, had never been uncrated and were in good condition when purchased by Mr. Gager. *337 Before crating at the factory, the materials had been treated to prevent damage from rust and corrosion. The climate in New Caledonia, where the crated materials had been stored prior to the sale to plaintiff, was such that little damage could be expected from rust or corrosion.
41. Plaintiff had intended to use the two warehouses as the nucleus of a business venture which he had hoped to establish in New Zealand. Plaintiff had discussed this matter with his wife, his father-in-law, Mr. Glavish, and with his wife’s uncle, a Mr. Ford. No partnership was ever formed.
42. When the buildings were sold by Mr. Glavish in May 1946, some four and a half months after their arrival in Auckland, he received $3,909.60 for part of the material included in the shipment. Under the terms of the sale contract concluded by Mr. Glavish, the buyer was obligated to return all unused material. Upon the buyer’s failure to return the material in question, Mr. Glavish instituted suit. In 1948, the remaining material was estimated to be worth approximately $1,400.[3]
43. In view of the scarcity of metal materials in New Zealand in 1946, the good condition of these materials, the actual price received by Mr. Glavish for part of the materials in the spring of 1946, and the estimated value of the remainder in 1948 when materials of this sort were more plentiful, the shipment had a sale value in January 1946, of approximately $5,000.
44. Because the materials were not delivered to plaintiff’s agent in December 1945, in accordance with the terms of the contract, plaintiff was damaged in the amount of $3,068.90, representing the market value of the goods at that time in New Zealand, less $953.70, the amount of customs duty plaintiff would have had to pay the New Zealand Government, and less $977.40, the amount Mrs. Gager received on the sale of the goods to her stepfather, Mr. Glavish.
*338 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United State three thousand sixty-eight dollars and ninety cents ($3,068.90).

 The warehouses were priced at $450 each, and the corrugated sheet metal at $8.33 a ton.

 The shipping ticket was undated. Inasmuch as the document described' in finding 5 acknowledged receipt of $1,000 from Lieutenant Bonica on. December 4, 1945, Lieutenant Bonica must have already received that amount from plaintiff. Accordingly, the shipping ticket must have been executed on or before December 4, 1945.

 The two warehouses were manufactured by the Great Lakes Steel Corporation, Stran Steel Division, Detroit, Michigan. During the war period, these buildings were manufactured for and sold to the Navy exclusively. The average price, f. o. b. factory, Detroit, Michigan, was $1,800 per building. After V-J Day in 1945, the buildings, redesigned, where necessary, to meet building codes, were sold to private industry, farmers, etc., at considerably higher prices. A price list filed in open court shows that as of November 1, 1947, a warehouse of the size purchased by plaintiff (40 ft. by 100 ft.) sold for $3,004, f. o. b. factory.